```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW HAMPSHIRE
```

Keith D. Bubar

   v.                                          Civil No. 11-cv-107-JL

Michael J. Astrue, Commissioner,
Social Security Administration


**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Keith Bubar moves to reverse the Commissioner's decision denying his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. The Commissioner moves for an order affirming his decision. For the reasons that follow, I recommend that the decision of the Administrative Law Judge ("ALJ") be affirmed.

**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d at 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could

justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

**Background**

The parties have submitted a Joint Statement of Material Facts, document no. 13.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Bubar last worked on October 17, 2008.  At his hearing, he testified that he was laid off that day, for economic reasons, but was on the verge of quitting for medical reasons.

Bubar began seeing Dr. John Fothergill in September of 2008 for neck and back pain resulting from two accidents, one that had occurred twenty years previously and one that had occurred six years previously.  Dr. Fothergill has made the following relevant assessments of Bubar's condition: backache, chronic pain, cervicalgia,[1] and shoulder joint pain.  Imaging has revealed: (1) "degenerative [osteoarthritis] involving the L5-S1

---

[1] Cervicalgia is neck pain.  See Stedman's Medical Dictionary 48, 351 (28th ed. 2006).

3

facet joints bilaterally," Administrative Transcript (hereinafter "Tr.") 209; (2) solid "fusion of C5 through C7," Tr. 241; (3) "no evidence of movement involving C5 through C7 from flexion to extension," id.; (4) "disk bulge osteophyte complex," Tr. 277; (5) "[d]isk herniation at C3-4 superimposed on degenerative changes with mild ventral spinal cord placement," id.; and (6) "[m]oderate neural foramen stenosis on the left at C3-4 and C4-5," id.  Dr. Fothergill has treated Bubar with a variety of medications including Celebrex,[2] OcyContin[3], Methadone,[4] and SoluMedrol.[5]

In addition, Bubar was once seen by Dr. William Spina, an orthopaedist, who assessed him with "[c]hronic neck pain related to previous trauma and subsequent degenerative changes at C4-C5 with no obvious neurologic deficit objectively but by history

---

[2] Celebrex is "a nonsteroidal anti-inflammatory drug . . . used for symptomatic treatment of osteoarthritis and rheumatoid arthritis." Dorland's Illustrated Medical Dictionary 317 (31st ed. 2007).

[3] OcyContin is "an opioid agonist analgesic derived from morphine." Dorland's, supra, at 1377.

[4] Methadone is "a synthetic opioid analgesic possessing pharmacologic actions similar to those of morphine and heroin." Dorland's, supra, at 1163.

[5] SoluMedrol is "a synthetic glucocorticoid derived from progesterone, used in replacement therapy for adrenocortical insufficiency and as an anti-inflammatory and immunosuppressant in a wide variety of disorders. Dorland's, supra, at 1171, 1756.

4

. . . some radicular symptoms." Tr. 239. Dr. Spina offered the following treatment plan: "Appropriate treatment has been administered by Dr. Fothergill. I don't think anything can be done surgically to help him at this point. He will have to live with the pain." Id.

In September of 2009, Dr. Jonathan Jaffe completed a Physical Residual Functional Capacity ("RFC") Assessment on Bubar. In it, he opined that Bubar had the capacity to: (1) lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; (3) sit (with normal breaks) for about six hours in an eight-hour workday; and (4) push and/or pull with no limitations other than those for lifting and/or carrying. He further opined that Bubar could frequently balance, kneel, crouch, crawl, and climb ramps and stairs, and that he could occasionally stoop and climb ladders, ropes, and scaffolds. Dr. Jaffe identified no manipulative, visual, communicative, or environmental limitations.

In October of 2010, Dr. Fothergill completed a Physical RFC Questionnaire on Bubar. Based on diagnoses of cervicalgia, chronic pain, and backache, Dr. Fothergill gave Bubar a poor prognosis and opined that he was not a malingerer. Turning to Bubar's RFC, Dr. Fothergill stated that Bubar could not walk even one city block without rest or severe pain, but that he

5

could: (1) sit for thirty minutes before needing to get up; (2) stand for ten or fifteen minutes before needing to sit down or walk around; (3) sit (with normal breaks) for less than two hours in an eight-hour workday; and (4) stand/walk (with normal breaks) for less than two hours in an eight-hour workday.  Dr. Fothergill further opined that Bubar needed a job that permitted him to: (1) walk around for ten minutes every thirty minutes; (2) shift positions at will from sitting, standing, and walking; and (3) take three or four unscheduled breaks of between ten and thirty minutes each in an eight-hour workday.  Regarding exertional limitations, Dr. Fothergill stated that Bubar could: (1) never lift or carry more than ten pounds; (2) occasionally lift and carry less than ten pounds; (3) occasionally crouch/squat and climb stairs; (4) rarely twist; and (5) never stoop or climb ladders.

    The ALJ conducted a hearing on Bubar's claim at which he took testimony from a vocational expert ("VE") to whom he posed several hypothetical questions.  The first hypothetical involved a person who: (1) was capable of sedentary work; (2) needed to alternate between sitting, standing, and walking, at will every thirty minutes; (3) could not climb ladders; (4) could only occasionally perform other postural activities; and (5) needed to avoid unprotected heights and moving machinery.  The VE testified that such a person could work as a food and beverage

6

clerk, as a touch-up inspector, and as an assembler. When the ALJ revised the foregoing hypothetical by reducing the lifting capacity to five pounds, the VE testified that there were no jobs that could be performed by a person with such an RFC.

After the hearing, the ALJ issued a decision that includes the following findings of fact and conclusions of law:

> 3. The claimant has the following severe impairment: degenerative disc disease of the cervical spine with facet arthropathy (20 CFR 404.1520(c)).
>
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> . . . .
>
> 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) allowing for alternating sitting, standing, or walking at will every 30 minutes. Additionally, the claimant may occasionally, climb ramps or stairs, and occasionally balance, stoop, kneel, crouch or crawl, but never climb ladders, ropes, or scaffolds. The claimant must also avoid unprotected heights, and moving mechanical parts due to dizziness.
>
> . . . .
>
> 6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
>
> . . . .
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there

> are jobs that exist in significant numbers in the
> national economy that the claimant can perform (20 CFR
> 404.1569 and 404.1569(a)).

Tr. 9, 11, 13, 14.  Based on the testimony of the VE, the ALJ determined that Bubar could work as a food and beverage clerk, as a touch-up inspector, and as an assembler.

## Discussion

According to Bubar, the ALJ's decision should be reversed, and the case remanded, because the ALJ rejected the opinions of both Drs. Fothergill and Jaffe.  As a result, Bubar asserts, the ALJ based his RFC assessment, at least in part, on his own interpretation of raw medical evidence rather than the opinion of a medical expert.

A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question in this case is whether Bubar was under a disability.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or

8

> which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled for the purpose of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process.  <u>See</u> 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

9

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that he is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witness; and (3) the plaintiff's educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

### B. Bubar's Argument

Bubar's argument hinges on the following statements from the ALJ's decision: (1) "I find limited objective evidence to support the level of functioning offered by Dr. Fothergill," Tr. 13; and (2) "I also find that the State assessment by Jonathan Jaffe, MD indicating light work, underestimates the claimant's limitations," id.  In Bubar's view, when the ALJ determined that his RFC fell somewhere between those stated by Drs. Jaffe and

Fothergill, he impermissibly "crafted an RFC assessment in part from [his] own assessment of the raw medical evidence." Kaylor v. Astrue, No. 2:10-cv-33-GZS, 2010 WL 5776375, at *4 (D. Me. Dec. 30, 2010) (recommending that the ALJ's decision be vacated and the case remanded where the ALJ rejected the opinions of both claimant's treating physician and the state-agency consultant).  In framing his argument, Bubar notes that "[h]ad the ALJ given Dr. Fothergill's opinion regarding [his] exertional and non-exertional limitations controlling weight, he would have found [him] reduced to a less than sedentary RFC." Cl.'s Mem. of Law (doc. no. 8-1), at 5.  But, Bubar is not arguing that the ALJ impermissibly failed to give Dr. Fothergill's opinion controlling weight; his argument is that the ALJ impermissibly relied on raw medical evidence when crafting his RFC.  In conjunction with that argument, Bubar contends that the ALJ failed to support his RFC in accordance with Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (S.S.A. 1996).

    The Commissioner, in turn, criticizes Kaylor for failing to cite the First Circuit's decision in Evangelista v. Secretary of Health & Human Services, 826 F.2d 136 (1st Cir. 1987), and points to a decision from this district affirming an ALJ's RFC determination where the ALJ did not rely on the opinion of the state-agency consultant and also declined to give significant

11

weight to the claimant's treating physician's opinion, see Chiasson v. Astrue, No. 10-cv-248-JD, 2010 WL 5173307, at *6-7 (D.N.H. Dec. 14, 2010). Chiasson, however, is of limited use here as Judge DiClerico was not asked in that case to apply the point of law for which Bubar cites Kaylor, i.e., that an ALJ is generally not permitted to adopt a limitation in his RFC that has not been directly stated as an opinion by an expert.

In Kaylor, as in this case, the ALJ did not fully credit either the opinion of the treating physician or the opinion of the state-agency consultant. See 2010 WL 5776375, at *4. There are, however, two different ways in which an ALJ can split the difference between two medical opinions. One is permissible; the other, arguably, is not.

Evangelista, on which the Commissioner relies, stands for the proposition that an ALJ faced with two conflicting medical opinions need not credit one or the other, in its entirety, but is entitled to craft an RFC by selecting individual functional capacities from both. See 826 F.2d at 144. As the Kaylor court explained Evangelista, "an administrative law judge may pick and choose among portions of expert opinions." 2010 WL 5776375, at *4. Thus, under Evangelista, it would be permissible for an ALJ to craft an RFC that, for example, incorporated the exertional limitations from a treating physician's RFC assessment and the

12

postural limitations from a state-agency consultant's RFC assessment.

What an ALJ may not to, however, at least according to Kaylor, is to chart a middle course between two divergent medical opinions on the same specific functional capacity. According to Kaylor, when an ALJ selects a functional capacity different from either of those ascribed to a claimant by the medical experts, the ALJ errs by crafting an RFC based on his or her own evaluation of raw medical evidence. See id. at *4. That, however, is not allowed by Gordils v. Secretary of Health & Human Services, 921 F.2d 327, 329 (1st Cir. 1990) ("since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record") (citing Rosado v. Sec'y of Health & Human Servs., 807 F.2d 292, 293 (1st Cir. 1986); Berrios v. Sec'y of Health & Human Servs., 796 F.2d 574, 576 (1st Cir. 1986); Lugo v. Sec'y of Health & Human Servs., 794 F.2d 15, 16 (1st Cir. 1986)). Thus, an ALJ might run afoul of Kaylor (and Gordils) if, for example, he or she determined that a claimant could occasionally lift and/or carry twenty pounds after rejecting a treating physician's opinion that the claimant could occasionally lift and/or carry only ten pounds and a state-agency consultant's opinion that the claimant could occasionally lift and/or carry fifty pounds.

13

The question here is whether the ALJ did what Evangelista says is permissible or, rather, did what Kaylor says is impermissible. In Kaylor, after stating generally that "with respect to the [claimant's] capacity to lift and/or carry, sit, stand, and walk, [the ALJ] rejected both [the state-agency consultant]'s and [the treating physician]'s opinions," 2010 WL 5776375, at *4, the court set out the RFCs assessed by both doctors and then compared them to the demands of sedentary work, which was the exertional level at which the ALJ said the claimant could perform, see id. That appears to be a useful analytical framework and, so, the court adopts it here. After comparing the ALJ's RFC to the medical opinions in the manner suggested by Kaylor, the court concludes that there is no functional capacity (or limitation) in the ALJ's RFC that is unsupported by a medical opinion. That is, the record discloses no basis for determining that the ALJ based the RFC he ascribed to Bubar on his own assessment of bare medical evidence.

With respect to postural activities, the ALJ's determination that Bubar had the capacity for occasional stair and ramp climbing and occasional crouching, and his determination that Bubar could never climb ladders, ropes, or scaffolds are all supported by Dr. Fothergill's RFC

Questionnaire.[6]  The ALJ's determination that Bubar had the capacity for occasional stooping is supported by Dr. Jaffe's RFC Assessment.  Finally, with regard to balancing, kneeling, and crawling, Dr. Jaffe opined that Bubar could perform those postural activities frequently.  Dr. Fothergill's RFC Questionnaire did not include questions on balancing, kneeling, and crawling so, necessarily, Dr. Fothergill offered no opinion on Bubar's capacity for performing those activities.  Even so, the ALJ determined that Bubar could perform them only occasionally, rather than frequently, as Dr. Jaffe had opined.  The court presumes that Bubar does not object to the ALJ's determination that he had less capacity for balancing, kneeling, and crawling than was indicated by Dr. Jaffe's RFC Assessment.

Turning to exertional capacity, the ALJ determined that Bubar had "the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) allowing for alternating sitting, standing, or walking at will every 30 minutes."  Tr. 11.  The regulation the ALJ cited provides as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job

---

[6] The court acknowledges that Dr. Fothergill's RFC Questionnaire mentioned stairs but not ramps, and mentioned ladders but not ropes or scaffolds.  That difference is inconsequential.

15

>     duties. Jobs are sedentary if walking and standing
>     are required occasionally and other sedentary criteria
>     are met.

20 CFR § 404.1567(a). The court begins with Bubar's capacity for lifting and then turns to his capacity for sitting, standing, and walking.

By saying that Bubar was generally capable of sedentary work, the ALJ determined that he had the RFC to occasionally lift or carry articles weighing less than ten pounds. Dr. Fothergill opined that "in a competitive work situation," Bubar could occasionally lift less than ten pounds. Tr. 274. In other words, with regard to lifting and carrying, the ALJ's RFC is fully supported by Dr. Fothergill's opinion.

All that remains is the sit/stand/walk component of sedentary work. According to Bubar:

>     The ALJ adopted Dr. Fothergill's assessment that
>     [he] required a job that permitted shifting positions
>     at will from sitting, standing or walking, but went on
>     to add that [he] needed to alternate sitting,
>     standing, [and] walking at will every 30 minutes.
>     (Tr. 11, 273)  Dr. Fothergill indicated [that he] was
>     significantly more limited in respect to sitting,
>     standing, and walking.  (Tr. 273)

Cl.'s Mem. of Law, at 7. Under Bubar's theory, the issue is not the extent to which the ALJ's RFC is less restrictive than Dr. Fothergill's; the issue is the extent to which the ALJ determined an RFC without support in the form of an expert opinion. Bubar does not say precisely what part of the ALJ's

16

RFC is not supported by an expert opinion. As best the court can tell, Bubar is objecting to the ALJ's determination that he had the RFC to perform a sedentary job as long as he was able to change positions every thirty minutes rather than being able to perform a sedentary job only if he could change positions completely at will, i.e., at any time.[7]

The court cannot say that the ALJ's finding with respect Bubar's need to change positions is not supported by an expert opinion. Dr. Fothergill did opine that Bubar could sit for thirty minutes at a time. He also opined that Bubar could only stand for ten or fifteen minutes at a time. But, given that the issue is Bubar's capacity for sedentary work, which involves primarily sitting and only occasional standing or walking, see 20 C.F.R. § 404.1567(a), the ALJ's RFC does not vary from Dr. Fothergill's opinion to such an extent that the latter does not support the former.

In short, there is no aspect of the ALJ's RFC that is not supported by a specific opinion from either Dr. Jaffe or Dr. Fothergill. Thus, this is not a case in which the ALJ went off

---

[7] With regard to the amount of time Bubar could spend sitting during an eight-hour workday, Dr. Fothergill opined that he could do so for less than two hours while Dr. Jaffe opined that he could do so for about six hours. Had the ALJ determined that Bubar could sit for four hours in an eight-hour workday then, perhaps, there might be a Kaylor problem. But Bubar does not appear to argue that point, and the record would not support such an argument.

on his own and crafted an RFC based on his own assessment of raw medical evidence. Accordingly, Bubar's reliance on Kaylor is unavailing.

After making his Kaylor argument, Bubar devotes several pages of his memorandum to an argument that begins with the assertion that the ALJ's RFC assessment did not satisfy the requirements of SSR 96-8p. In support of that argument, he criticizes the ALJ for minimizing the results of an MRI, failing to discuss various office notes from visits he made to Dr. Fothergill, and erroneously finding that his medical providers had not discussed surgical options.[8] According to Bubar, because the ALJ failed to address certain treatment records, he "failed to support his conclusions in the RFC he assessed, which is required by SSR 96-8p." Cl.'s Mem. of Law, at 11.

SSR 96-8p requires that an ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." 1996 WL 374184, at *7. Here, the ALJ's decision includes nearly two pages of narrative explaining

---

[8] On this point Bubar is correct. While the ALJ said that "[t]here is no indication that any additional surgical option has been discussed," Tr. 12, the record includes Dr. Spina's initial orthopedic evaluation in which he noted that he "didn't think anything [could] be done surgically to help [Bubar] at this point," Tr. 239. The ALJ's error, while unfortunate, does not by itself warrant a remand.

18

the RFC he ascribed to Bubar. For his part, Bubar does not argue that the ALJ failed to describe the evidence supporting his RFC assessment. Rather, his principal criticism is that the ALJ failed to discuss certain pieces of evidence which, in his view, are favorable to his claim. SSR 96-8p requires an ALJ to describe the evidence supporting his or her conclusion, which the ALJ did here. It does not require an ALJ to discuss each and every piece of evidence in the record.[9] Moreover, the mere existence of evidence that supports a claimant's position, or even a quantum of evidence sufficient to support a decision in a claimant's favor, is not enough to show that an ALJ's decision to deny a claim was not supported by substantial evidence. See Tsarelka, 842 F.2d at 535. In short, Bubar's argument that the ALJ did not properly support his RFC assessment is unavailing.

## Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Bubar's claim, see Manso-Pizarro, 76 F.3d at 16, I recommend that: (1) Bubar's motion for an order reversing the Commissioner's decision, document no. 8, be denied; and (2) the Commissioner's motion for an order affirming his decision, document no. 12, be granted.

---

[9] To be sure, the relevant regulations required the ALJ to explain the weight he gave to both of the medical opinions in this case. See 20 C.F.R. § 404.1527(d)(2) & (f)(2)(ii). He did so.

19

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice. See Fed. R. Civ. P. 72(b)(2). Failure to file objections within the specified time waives the right to appeal the district court's order. See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011) (citing United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008)); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge

December 5, 2011

cc: Robert J. Rabuck, Esq.
    D. Lance Tillinghast, Esq.